UNITED STATES of America, Plaintiff,

v.

CERTAIN LAND IN the CITY OF LINCOLN, etc., Defendants.

Civ. No. 1568 L.

United States District Court, D. Nebraska.

June 2, 1972.

Randall A. Rinquest, Omaha, Neb., for plaintiff.

C. Russell Mattson, Lincoln, Neb., for defendants Joseph I. Christensen and Marian S. Christensen.

## MEMORANDUM ON MOTION FOR NEW TRIAL

URBOM, Chief Judge.

Joseph I. Christensen and Marian S. Christensen are the owners of Tracts 10 and 11 in downtown Lincoln, Nebraska, which are the subject of this condemnation proceeding by the United States. On February 5, 1972, a jury returned a verdict in the amount of $78,000.00 as the just compensation for the landowners, who have moved for a new trial on the ground of alleged misconduct of a juror.

The specific allegation of misconduct is that the juror made one or more unauthorized visits to the premises which were the subject of the action. From a hearing on March 9, 1972, the following facts have emerged:

During the trial but before deliberations began one of the jurors, Richard N. Schade, drove on O Street in Lincoln, Nebraska, past the property which was the subject of the condemnation action and which consisted of two lots containing two business buildings. He passed the property twice daily to get to and from his home in Plattsmouth, Nebraska, and the federal courthouse in Lincoln. O Street is a normal route to take from Plattsmouth to Lincoln. No admonition was given any of the jurors by the presiding judge not to pass, look at, or examine the property. On at least one occasion Mr. Schade drove around the property from the rear, moving to about 100 to 150 feet from the property, but did not alight from his automobile. He looked at the property because he had never purchased any property without looking at it and thought that looking at this property would give dimension to his thinking, which the photographs in evidence did not provide, and would let him know whether the building had had "tender, loving care."

On looking at the building he could see almost nothing except the outside of the building. He saw a large hole about 2 or 2½ feet by 5 or 6 feet in dimension through the outside wall in the back of the building above the rear door. He also saw that a ventilator was bent upward which caused him to think that something like a forklift had been used to raise the ventilator straight up. From his view he concluded that Mr. Christensen, the landowner, had left the property in "terrible" condition. The juror's impression of the general condition of the building was changed by his view of the building. There was no indication by the evidence at the trial that the hole in the wall or the bending of the ventilator occurred prior to the date of the taking, July 18, 1969. During the deliberations Mr. Schade told the other jurors that he had visited the property, told them what he had seen, and told them that if they had seen the property they would not award the landowner as much as they then wanted to.

When Mr. Schade voted to accept the verdict which later was returned, his decision was "probably" affected by his having viewed the premises. His view "probably" indicated a lower valuation than he would have had without the viewing.

It was stipulated in the course of the hearing that neither the parties nor their counsel knew of any of the foregoing acts of Mr. Schade until the verdict had been returned.

In the course of the hearing on the motion for a new trial an affidavit of Mr. Schade was received in evidence. Thereafter the United States elicited Mr. Schade's oral testimony, which corroborated and expanded upon his affidavit.

In this condemnation action the date of taking was July 18, 1969. The trial began some two and a half years later. Thus the observations of the property by the juror showed conditions as they existed some two and a half years after the date of taking. At the trial it was apparent that the property remained vacant during most of the two-and-a-half year intervening period. It is unquestionable that the ventilator was bent and the hole was made in the exterior wall after the date of taking. Deterioration in the overall appearance of the outer walls of the building was inevitable during the period of vacancy because of the lack of maintenance during the period of inoccupancy. In addition, the hole in the exterior wall and the ventilator no doubt contributed to the overall appearance of neglect and deterioration.

■ The difference in the appearance of the building between the date of taking and the date of the view by the juror is of the kind and degree likely to cause a juror to arrive at a lower valuation than he would have had without an observation of the building during the trial. On that basis I conclude that there has been clear prejudice to the defendant landowners. That conclusion is reached independent of the juror's testimony that the observation of the premises "probably" resulted in a lowered valuation in his thinking.

■ That Mr. Schade was not aware that he should not make an observation of the building is of no importance. His motives cannot determine the question of prejudice. As the presiding judge, I take full responsibility for not having cautioned the jurors to avoid the area of the property, but, again, fixing responsibility affords no assistance in deciding the existence or nonexistence of injury to the defendant landowners.

There are two major questions which come into view from a consideration of the aforementioned facts. The first is whether the affidavit of the juror was properly admissible. The second is whether the established facts declare, by an objective standard, a need for setting aside the verdict and granting a new trial. Both questions deserve extensive consideration.

### ADMISSIBILITY OF A JUROR'S AFFIDAVIT

The ancient rule that the testimony of a juror would not be heard to impeach the jury's verdict was established by Lord Mansfield in 1785 in the case of Vaise v. Delaval, 1 Term R. 11 (A.B. 1785), where affidavits were offered to show that a decision was based upon chance. The affidavits were rejected, L.C.J. Mansfield saying:

"The court cannot receive such an affidavit from any of the jurymen themselves, in all of whom such conduct is a very high misdemeanor; but in every such case the court must derive their knowledge from some other source, such as some person having seen the transaction through a window or by some such other means."

This rule came to be well established in England and received almost unquestioned adherence in the United States. The doctrine is based upon the rule that a "witness shall not be heard to allege his own turpitude." Thus, a juror could not testify as to his own misconduct; an affidavit of a juror alleging his misconduct could not be received to show that such misconduct did in fact occur.

The consideration behind the rule in this country was stated by Mr. Justice Lamar in McDonald v. Pless, 238 U.S.

264, 267–268, 35 S.Ct. 783, 59 L.Ed. 1300 (1915):

" . . . [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference."

Lord Mansfield's rule, however, was subject to early criticism both in England and the United States. See, 8 Wigmore, Evidence, § 2353, p. 696 (McNaughton rev. 1961).

In the 1892 case of Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L. Ed. 917 (1892), the court considered the admissibility of affidavits of jurors to show extraneous influence—specifically, comments of the bailiff and a newspaper article about the case—upon the jury in the course of their deliberations. The affidavits did not purport to state what influence the communications or the article had upon the jury but set forth what had been said by the bailiff and what had been contained in the newspaper article. Mr. Chief Justice Fuller stated the general rule forbidding use of jurors' affidavits and then said:

"There is, however, a recognized distinction between what may and what may not be established by the testimony of the jurors to set aside a verdict.

"This distinction is thus put by Mr. Justice Brewer, speaking for the Supreme Court of Kansas in Perry v. Bailey, 12 Kan. 539, 545: 'Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because, being personal, it is not accessible to other testimony. It gives to the secret thought of one the power to disturb the expressed conclusions of twelve. Its tendency is to produce bad faith on the part of a minority; to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict. But as to overt acts, they are accessible to the knowledge of all the jurors. If one affirms misconduct, the remaining eleven can deny. One cannot disturb the action of the twelve; it is useless to tamper with one, for the eleven may be heard. Under this view of the law, the affidavits were properly received. They tended to prove something which did not essentially inhere in the verdict, —an overt act, open to the knowledge of all the jury, and not alone within the personal consciousness of one.'

"The subject was much considered by Mr. Justice Gray, then a member of the Supreme Judicial Court of Massachusetts, in Woodward v. Leavitt, 107 Mass. 453, where numerous authorities were referred to and applied, and the conclusions announced 'that, on a motion for a new trial on the ground of bias on the part of one of the jurors, the evidence of jurors, as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict. But a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind. So a juryman may testify in denial or explanation of acts or declarations outside of the jury room, where evidence of such acts has been given as ground for a new trial.' . . .

"We regard the rule thus laid down as conformable to right reason and sustained by the weight of authority.

These affidavits were within the rule, and being material, their exclusion constitutes reversible error. . . ." 146 U.S. at 148–149, 13 S.Ct. at 52

■■ It would thus appear that an affidavit may be admissible under limited circumstances to show misconduct on the part of a juror. I think it is a reasonable interpretation of *Mattox* that it is not necessary that the misconduct complained of be *proved* by other evidence, but that it be *provable* by other evidence. Thus, a juror's affidavit, if the affidavit describes misconduct of a nature provable by outside evidence, may properly be admitted; it is subject to refutation by other jurors or by other evidence. That is the present case. Mr. Schade's affidavit states neither his mental processes nor conversations with other jurors which led to his agreement with the verdict. It states simply that he visited the premises during the trial for the purpose of studying them and recounts what he saw. His acts and the condition of the property at the time he saw it were objective facts, capable of affirmance or rebuttal by others. That is sufficient for employment of the affidavit, as well as the oral testimony, of the juror, Schade.

Admitting the affidavit into evidence in this case is within the exception noted in *Mattox* and not withdrawn in *McDonald*.

Professor Wigmore has roundly criticized Lord Mansfield's rule, tagging it a "curious doctrine of evidence . . . now here persisting through the sponsorship of Lord Mansfield's great name . . . ."[1] More sensibly, Wigmore argues, the proof of misconduct should be determined by the parol evidence rule, whereby the written act, the verdict, is not variable but investigation may be had to determine whether the act was accompanied by required formalities.

Professor Wigmore's criticism of the rule is gaining acceptance in modern cases. The rule is often stated now in order to note its exceptions. At least four theories have been advanced to justify departure from the general rule prohibiting use of a juror's testimony or affidavit. One has been that a court has general supervisory powers over the jury and may therefore recall and interrogate them if justice so requires. Morley v. Cranmore Skimobiles, 67 F.Supp. 812 (U.S.D.C.N.H.1946). A second is that a juror's testimony may be received if it relates to extraneous influences brought to bear on the jurors. Mattox v. United States, supra. A third is that a juror may impeach his verdict if the misconduct has been serious enough, as he will, by his misconduct, have already disqualified himself as a juror and is therefore no longer serving in that capacity. Aluminum Company of America v. Loveday, 273 F.2d 499 (C.A. 6th Cir. 1959). And finally, a juror's testimony may be received if the court feels that the least public injury will result in the court's determining from the juror whether his misconduct injured a party litigant. Kilgore v. Greyhound Corporation, 30 F.R.D. 385 (U.S.D.C.E.D.Tenn. 1962).

Although I find little case support in the reported decisions of the United States Court of Appeals for the Eighth Circuit, neither do I find anything which precludes the result here attained. An examination of the cases reveals that the Eighth Circuit has indeed recognized the validity of the general rule. I believe it can be determined, at least inferentially, that the Eighth Circuit would countenance a departure from the general rule in a proper case.

In United States v. Kansas City, Missouri, 157 F.2d 459 (C.A. 8th Cir. 1946), the court considered the question of whether the unauthorized visiting by members of the jury of the premises to be condemned by the government constituted such jury misconduct as to require the granting of a new trial. In that case the government sought a new trial,

---

1. 8 Wigmore, Evidence, § 2352, pp. 695–6 (McNaughton rev. 1961).

basing its motion on affidavits from the jurors that they had visited a park over which the government sought an easement in order to construct a 115,000 volt electric transmission line. The trial court denied the motion for a new trial. In affirming the trial court, Judge Gardner said:

"The appellee vigorously challenges the competency of affidavits of jurors to impeach their verdict and as the trial court filed no opinion in denying the motion for a new trial, we cannot determine what, if any, weight the court gave to these affidavits in considering the motion for new trial. In this state of the record we must assume that the court considered only competent evidence. It should be noted that there is no contention that the jury was tampered with, nor that the appellee or its counsel had any knowledge of any misconduct on the part of any of the jurors in the trial of this proceeding. Before proceeding to an examination or consideration of the contents of the affidavits of five different jurors it may be stated as a general rule that the testimony or affidavits of jurors seeking to impeach their own verdict should not be considered on a motion to set aside the verdict on grounds of irregularity or misconduct on the part of the jury or some one or more of the panel. . . ."

157 F.2d at 460

In stating the rule the court relied heavily upon the statement in 53 Am.Jur. § 1105, which sets forth the public policy of the rule. That statement is much like the statement in McDonald v. Pless, supra; that is, to allow the testimony or affidavits of jurors to impeach their own verdict would be to subject the jurors to harassment by overzealous litigants. However, the Court of Appeals did then proceed to consider the content of the affidavits to determine that no prejudice had resulted from the unauthorized viewing of the condemned premises. In the later cases of Farmers Co-operative Elevator Association Non-Stock, Big Springs, Nebraska v. Strand, 382 F.2d 224 (C.A. 8th Cir. 1967), and Chicago, Rock Island and Pacific Railroad Company v. Speth, 404 F.2d 291 (C.A. 8th Cir. 1968), the court again reaffirmed its adherence to the general rule. In Chicago, Rock Island and Pacific Railroad Company v. Speth, supra, the court said:

"If the court's interrogation of the jury as to the amount of the verdict could be condoned in the instant case, then it would logically follow that the court or counsel could seek to correct a verdict on matters that are traditionally considered inherent in the verdict. . . . Such a rule may seem harsh, but it is premised upon sound reasons of public policy. It is well settled that a jury's misunderstanding of testimony, misapprehension of law, errors in computation or improper methods of computation, unsound reasoning or other improper motives cannot be used to impeach a verdict. These matters all inhere in the verdict itself. . . ."

404 F.2d at 295

Additionally, in Farmers Co-operative Elevator Association Non-Stock, Big Springs, Nebraska v. Strand, supra, the court said:

"The items set out in the juror's affidavit all related to matters which took place in the jury room and which inhere in the verdict. It is a well-established rule in the federal courts and the Nebraska court that a jury verdict may not be impeached as to occurrences in the jury room which inhere in the verdict by an affidavit of a juror. . . ."

382 F.2d at 230

These cases do not preclude the admission of juror Schade's affidavit into evidence. Buttressing this conclusion is this statement in Stephenson v. Steinhauer, 188 F.2d 432, 439 (C.A. 8th Cir. 1951):

"The testimony of a juror may not *ordinarily* be received to show matters which influenced or affected the

jury's deliberations and *ordinarily* a juror may not impeach his own verdict *although such testimony might be received as to any facts bearing upon the existence of any extraneous influence. . . .* " (Emphasis added)

■ I conclude that affidavits and testimony of jurors may be received to show misconduct which is of a nature provable by external evidence and which does not relate solely to the deliberative process. I shall therefore consider juror Schade's affidavit and testimony, exclusive of that pertaining to the effect of the visitations upon his valuation, as evidence of acts of alleged misconduct.

### PREJUDICIAL EFFECT OF THE UNAUTHORIZED VIEW

I do not indicate that I necessarily believe the verdict would have been larger had the view not taken place, nor can I in any way assume that a retrial of this matter would or should result in a larger verdict. I must attempt, however, to determine by an objective standard whether the view of these premises would be likely to affect the verdict. On that basis I am persuaded that the answer must be in the affirmative.

It seems inevitable that a building, vacant for a period of two and a half years, would suffer deterioration. The overall appearance of neglect which would undoubtedly be manifested in a view of the condemned property would be almost certain to affect at least that person's estimate as to the value of the property. The prejudice is perhaps more strongly inferable in condemnation proceedings than in some others, because in a condemnation action the landowner is constitutionally entitled to just compensation for the property taken. That compensation must be determined as of the date of taking. Evidence which would tend to show that the value may have been determined by the jury as of any other date is, I think, sufficient to render the verdict invalid.

Because I have not relied upon any evidence from the juror Schade that his

view of the premises affected the valuation that he assigned to the property, I consider it appropriate to note that I would also decline to consider evidence of the fact that Schade's view of the premises and any statements that might have been made to fellow jurors as to the condition of the property had no effect on either his valuation or the ultimate verdict of the jury. I do not subscribe to the notion that testimony from jurors may be received in support of the verdict, while it is refused to impeach the verdict. In both cases the evidence is properly excluded if it is evidence of conduct which necessarily inheres in the verdict, such as conversations among jurors and statements of a juror's mental processes in deliberation. I further note that this is not an instance in which a dissatisfied juror is attempting by affidavit alleging misconduct to upset a verdict agreed to by twelve jurors. Thus, while a rule of inadmissibility of a juror's affidavits and testimony may have a sound basis in policy, I do not believe that any of those policy considerations exist in this case.

The defendant landowners are entitled to a new trial and an appropriate order will be entered.